**Affirmed and Memorandum Opinion filed March 28, 2023.**



**In The**

# Fourteenth Court of Appeals

**NO. 14-21-00550-CV**

**JOSEPH CLAUDE HENRY, Appellant**

**V.**

**MEGAN ANN WHITLOCK-HENRY, Appellee**

**On Appeal from the 280th District Court
Harris County, Texas
Trial Court Cause No. 2021-52332**

## MEMORANDUM OPINION

This is an appeal from a thirty-five year family-violence protective order entered in favor of appellee, Megan Ann Whitlock-Henry. In the amended protective order, the trial court found that appellant Joseph Claude Henry committed family violence, was likely to do so in the future, and committed an act constituting a felony offense. Joseph challenges the amended protective order and contends (1) there is legally and factually insufficient evidence to support entry of the amended protective order, (2) there is neither statutory authority nor sufficient evidence to support the

duration of the amended protective order, and (3) the trial court did not have the authority to include numerous provisions in the amended protective order that infringe upon Joseph's rights. For the reasons set forth below, we affirm.

## *Background*

Joseph and Megan married in 2017. The parties did not have any children together, but both parties had children prior to the marriage.[1] According to Megan, Joseph's behavior became increasingly violent and erratic after they were married.

On August 20, 2021, Megan applied for a protective order under chapter 85 of the Family Code. In her affidavit in support of her request for a protective order, Megan described the preceding events as follows:

> The following are examples of Joseph's destructive behavior: On September 9, 2020, Joseph began punching holes in the wall of our master bedroom. At the time, Joseph was experiencing a fit of blinding anger and I could not reach him with words . . . . On April 29, 2021, Joseph punched holes in the wall of my step-daughter, Claire's bedroom. Joseph has also punched holes in the walls of our TV room and sawed down the door in the TV room. During his fits of rage, Joseph has even thrown chairs and personal objects, and burned cash money on the gas stove. . . . On August 17, 2021, I had a disagreement with Joseph which escalated into an assault on my life. During our car ride home from dinner, Joseph became enraged and lunged at me. My daughter was in the car during this incident and witnessed Joseph strangle me. He had a firm grip on my neck and began banging my head against the car window as I struggled to break free.

That same day, the trial court signed a temporary protective order and show cause order directing Joseph to appear via Zoom to show cause why the court should

---

[1] Joseph had two adult children, Calvin Claude Henry and Claire Elizabeth Henry. During Joseph and Megan's marriage, Calvin resided in Georgia, and Claire resided with them at the marital home during college breaks. Megan had one minor child, L.G.K., who resided with the parties in the marital home.

2

not issue a protective order. During the evidentiary hearing, Megan and Joseph both appeared with counsel. Megan, Keely Suitor, Gary Whitlock, and Joseph testified at the two-day protective order hearing.

**Megan's Testimony**. Megan testified about Joseph's steadily escalating episodes of extreme anger, destruction of property, and threatening behavior. She attested that Joseph's behavior concerned and frightened her. She described his behavior as "fits of rage" that began with Joseph raging at an "adamant object or situation" and then turning his anger towards her. She attested that when Joseph was extremely angry, he would call her names such as "a horrific wife," "the worst person that he's ever married," a "lived-hard," "a snowflake," and "a retard liberal."

She avowed that during these "episodes," Joseph "work[ed] himself into such a rage" that he punched walls in the marital home. She testified about three separate occasions where Joseph punched holes in the walls of the marital home. On one occasion, he punched the light switch with such force that he bloodied his knuckles and splattered blood on the wall. On another occasion, he sawed down the door to their TV room because he was angry that the door would not close properly. In addition to testimony about property destruction, Megan described an occasion where Joseph left a bruise on her. She stated that Joseph was trying to move past her and pushed her out of his way and into a wall, which resulted in a bruise on her arm.

Megan provided substantial testimony about the physical assault that occurred on August 17, 2021 and was the catalyst for her requesting a protective order. She testified that she and Joseph went to dinner with Claude, Claire, and L.G.K. An "argument ensued at the end of dinner," and they "continued arguing outside the restaurant to the point of getting into [her] car." She asserted that Joseph was in the driver's seat, and her daughter, L.G.K., was sitting behind her. Megan testified that Joseph "was having a fit of rage and . . . lunged across the car . . . grabbed [her] neck

3

with both of his hands while he was screaming . . . and just squeezed [her] neck while he was pushing [her] against the window of the car." She attested that she could not breathe while Joseph's hands were around her neck. She stated her neck was "quite swollen . . . [and] it had red marks." Megan further attested that this act of violence occurred in front of L.G.K., who subsequently expressed that she was fearful of Joseph.

In the early morning hours following the physical assault, Megan testified that Joseph sent her concerning text messages. The trial court admitted text messages where Joseph sent Megan the following:

> You are the most evil, lying, manipulative bitch I've ever known. Of all I've done for you and given you. You were done with me months ago but not adult enough to admit it. You have treated me like dirt. I have no feelings for you whatsoever. It makes me sad that [L.G.K.] will never have as loving a man in her life because you don't deserve one. You are a piece of gutter shit. You are not my wife. You are a thief. An amoral, hateful devil.

> And Claire is a much better person than you could dream of being. If you ever attack her again I will kill you. Yes, megs shitty lawyers, that is a threat. Attack my kids again, your life ends.

She testified that she believed Joseph wanted to kill her or L.G.K based on the text messages. She also asserted that after the text messages, Joseph also emailed her. The trial court admitted the email, and in relevant part, the email stated:

> I apologize for all my mean and vicious words and actions, all of which came from a childish and most often drunken place. . . . Many actions and words are horrible, reprehensible and indefensible. Some of those are unforgiveable. . . . Now that you've left me, I have nothing more to fear. I am living in my deepest pain. I am facing my abandonment directly and proximately. I'm staring into the abyss. I have no more to lose. . . . I have been weak in managing my depression and anger, which is rooted in fear and not strength. I have allowed my anger to manifest in physical violence, which is not defensible in any circumstance. I have made you feel unsafe, when your safety is my responsibility. . . . I have

4

been drunk too much and too often. I have been arrogant in my drinking. I did not encourage you when you were working on sobriety. . . . I am making an appointment to go back to a doctor to reevaluate depression medications. I need to find one that balances right and works for me, however long that takes. I will be working on my anger and irritability. . . . If AA or another program is appropriate, I will follow that road.

**Keely's Testimony**. Keely, Megan's co-worker, testified that on the night of the physical assault, she went to Megan's house after receiving a text message from another party. She stated that when she arrived, she met with Megan, who was very upset and crying.  Keely asked Megan what was wrong, and Megan "informed [her] that she had been assaulted by [Joseph]" and that "he had placed his hands around her neck and strangled her." Keely stated that she did not see bruising or marks but noticed that Megan's neck "looked puffy." Keely asserted that Megan was extremely upset and said that she had twelve hours to vacate the residence.

Keely testified that she called the Bellaire Police Department to report the physical assault and that officers responded within ten to fifteen minutes. Keely also testified that the officers were present for over an hour and spoke with both Megan and L.G.K. Keely remained at the residence with Megan because Megan "was very concerned about some continuity for [L.G.K.], about getting [L.G.K.] to school and trying not to upset [L.G.K.'s] routine for the first day of school."

Keely stated that the following morning, Joseph returned to the house. Keely overheard a conversation where Megan told Joseph that she wanted to work out an amicable way to end their marriage and Joseph expressed that it was not his desire. Keely observed that Joseph was "unhappy" with the thought of the marriage ending and overheard him tell Megan that it was her fault. Keely described Joseph's tone as "somewhat belligerent" and that "he was forceful about stating . . . that it was entirely [Megan's] fault."

5

**Gary's Testimony**. Gary, Megan's father, testified that on August 17, 2021, he was at his Michigan home with his wife, Pam. He testified that he missed a call from Megan and called her back on FaceTime.[2] Megan was "extremely distraught," and he could see her "really crying." Gary testified that Megan told him that Joseph "slammed [her] head against the window and choked [her] . . . [and] tried to kill [her]." While Gary was on the phone with Megan, Pam was on the phone with Joseph.

Gary stated that Pam had Joseph on speaker phone, and Gary heard Joseph "screaming and cursing" that Gary should "come get [his] fucking psychotic daughter now or [Joseph would] kill her . . . . She's a devil and she's evil." Gary asked Joseph directly if Joseph physically touched Megan and Joseph admitted that he "did this time but it was the first time." Gary asserted that his goal was to calm Joseph as much as possible. He later testified that based on the physical assault, he believed Megan's life was in danger, and he retained a private security firm to protect her and L.G.K.

Gary also received an email from Joseph apologizing for his actions on the night of the physical assault. The email stated that "on Tuesday . . . I did horrible things that are not defensible regardless of the circumstance" and "I hope someday in the future to have an opportunity to apologize to [L.G.K.], who is the real innocent victim in all of this."

**Joseph's Testimony**. Joseph provided minimal testimony. He stated that (1) he was a licensed attorney; (2) there was a warrant out for his arrest; (3) as of the date of the hearing, he had not submitted himself to law enforcement to cure the warrant; and (4) he was at the marital home the day he was served with the protective

---

[2] FaceTime is a video chat application developed for Apple products.

6

order.

When questioned on direct examination about the physical assault occurring on August 17, 2021, Joseph invoked his fifth amendment right against self-incrimination. Similarly, when questioned about the property destruction at the marital home and the bruise on Megan's arm, Joseph invoked his fifth amendment right. When questioned about his daughter Claire's permanent residence and why she was at the marital home after the protective order was served, Joseph also invoked his fifth amendment right. There was not a cross-examination.

At the conclusion of the evidentiary hearing, the trial court signed an amended protective order. Joseph subsequently requested findings of fact and conclusions of law and moved for a new trial, contending that the parties were now divorced,[3] did not have any contact, and the evidence was legally and factually insufficient to support the trial court's protective order. The trial court issued findings of fact and conclusions of law, and the motion for new trial was denied by operation of law. Joseph filed a timely notice of appeal.

*Discussion*

In three issues, Joseph challenges (1) the legal and factual sufficiency of the evidence in support of the trial court's amended protective order; (2) the sufficiency of the evidence in support of the duration of the amended protective order; and (3) several conditions ordered by the trial court in the amended protective order.

I.      **Sufficiency Challenge**

---

[3] On August 20, 2021, the date that Megan applied for a protective order, she also filed her divorce petition and requested a temporary restraining order. The temporary restraining order was signed on August 25, 2021 and later set for a hearing on September 13, 2021. On September 13, 2021, the parties entered in a mediated settlement agreement, and the final decree of divorce was later signed on October 29, 2021.

In his first issue, Joseph contends that there is legally and factually insufficient evidence to support the entry of the final protective order. Joseph does not challenge the trial court's finding that family violence occurred; rather, he argues the evidence is legally and factually insufficient to support the trial court's finding that family violence is likely to occur in the future. *See* Tex. Fam. Code § 85.001(a).

## A. Legal Sufficiency

Joseph posits that "one incident" of family violence in the past does not support the conclusion that another incident of family violence is likely to occur in the future. Joseph instead suggests that evidence of future family violence "involve[s] evidence of ongoing harassment, threats, or—at a minimum—some degree of coercive or threatening contact between the parties." We disagree because such a requirement is contrary to the legislative intent of the protective order statute. *See id.* at §§ 81.001, 85.001; *see also Rodriguez v. Doe*, 614 S.W.3d 380, 386 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

The Family Code provides for issuance of a protective order if the trial court finds that family violence has occurred and is likely to occur in the future. *See* Tex. Fam. Code §§ 81.001, 85.001(b). "Family violence" is defined, in pertinent part, as an

> act by a member of a family. . . against another member of the family . . . that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

*Id.* § 71.004(1). "Family" is defined to include "individuals who are the parents of the same child." *Id.* § 71.003. Given the remedial nature of the Family Code's protective order provisions, courts broadly construe its provisions to effectuate its "humanitarian and preventative purposes." *Rodriguez*, 614 S.W.3d at 385 (quoting

*Boyd v. Palmore*, 425 S.W.3d 425, 430 (Tex. App.—Houston [1st Dist.] 2011, no pet.)). The general rule is that the duration of a Family Code protective order may not exceed two years, although the court may issue a protective order for a longer period if the court finds that the respondent "committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household . . . ." Tex. Fam. Code § 85.025(a), (a-1).

When the trial court acts as a factfinder, we generally review its findings under legal and factual sufficiency standards. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Caballero v. Caballero*, No. 14-16-00513-CV, 2017 WL 6374724, at *3 (Tex. App.—Houston [14th Dist.] Dec. 14, 2017, no pet.) (mem. op.).

When both legal and factual sufficiency challenges are raised on appeal, we must first examine the legal sufficiency of the evidence. *City of Houston v. Cotton*, 171 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). In a legal sufficiency challenge, we view the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 807, 827.

A legal sufficiency challenge to a family violence protective order may be sustained only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Caballero*, 2017 WL 6374724, at *3. More than a scintilla of evidence exists if the evidence furnishes some basis for reasonable minds to reach differing conclusions about a vital fact's existence. *See Lee Lewis Constr., Inc. v.*

*Harrison*, 70 S.W.3d 778, 782–83 (Tex. 2001).

The trial court heard testimony from Megan, Keely, and Gary regarding Joseph's abusive behavior towards Megan. The trial court also heard testimony that on August 17, 2021, Joseph's steadily escalating episodes of extreme anger, destruction of property, and threatening behavior culminated in a physical assault on Megan in the presence of her minor child. The trial court admitted a text message where Joseph threatened to kill Megan, as well as an email where Joseph admitted to substance abuse and mental health problems. The trial court also admitted, without objection, the charging instrument from the Bellaire Police Department indicating that Joseph was charged with "Assault of Family Member – Impeding Breathing"— a third degree felony.

The statutory language of the Family Code does not require that a likelihood finding be based on more than one act of family violence. *See* Tex. Fam. Code §§ 81.001, 85.001(a); *see also In re Lee*, 411 S.W.3d 445, 451 (Tex. 2013) (statute's plain language is "surest guide" to legislative intent). On the contrary, courts have recognized that "[o]ftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." *Boyd*, 425 S.W.3d at 432 (quoting *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.)). Under this principle, an act of family violence during one incident would permit a finding that the actor was likely to engage in future family violence. *Id.*; *see Carson v. Carson*, No. 07-16-00311-CV, 2017 WL 4341456, at *3 (Tex. App.—Amarillo Sept. 29, 2017, no pet.) (mem. op.); *Collier v. State*, No. 12-13-00142-CV, 2013 WL 4769267, at *3 (Tex. App.— Tyler Sept. 4, 2013, no pet.) (mem. op.).[4]

---

[4] Although in some cases there is a pattern of family violence, such as in both *Teel v. Shifflett*, 309 S.W.3d 597 (Tex. App.—Houston [14th Dist.] 2010, pet. denied), and *Clements v.*

This legally sufficient evidence supports a finding that Joseph committed family violence against Megan when he choked her and impeded her ability to breathe. *See* Tex. Fam. Code § 71.004(1). On this record, there is more than a scintilla of evidence that family violence is likely to occur in the future. *See City of Keller*, 168 S.W.3d at 810. Thus, Joseph's commission of an act of family violence on August 17, 2021, along with his threat to kill Megan in a text message permits a finding that he was likely to engage in future family violence. *See Boyd*, 425 S.W.3d at 432; *see also Martin v. Martin*, 545 S.W.3d 162, 168 (Tex. App.—El Paso 2017, no pet.) (holding commission of act of family violence on March 21 would permit finding that appellant was likely to engage in future family violence; applicant filed for protective order on March 22).

Accordingly, we conclude that the evidence is legally sufficient to support a finding that Joseph is likely to commit family violence in the future. *See* Tex. Fam. Code § 85.001(a).

## B. Factual Sufficiency

Joseph also argues that "one incident" of family violence when the parties were married and lived together is not factually sufficient to support a likelihood of future family violence when he does not have any interest in continued contact with Megan, the parties are now divorced, and they share no children. We disagree.

When reviewing the factual sufficiency of the evidence, we examine the entire record, considering evidence both in favor of and contrary to the challenged findings. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We will set aside a factual finding only if it is so contrary to the overwhelming weight of the evidence as to be

*Haskovec*, 251 S.W.3d 79 (Tex. App.—Corpus Christi 2008, no pet.), these cases have not held that such a pattern of family violence is a necessary prerequisite to a likelihood finding. *Boyd*, 425 S.W.3d at 432.

clearly wrong and unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight afforded to their testimony. *GTE Mobilnet of S. Tex. Ltd. v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We will not substitute our judgment for that of the factfinder merely because we might reach a different conclusion. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

Contrary to Joseph's assertion that there was only "one incident" of family violence, the record before us contains other occasions of family violence. Megan testified that Joseph (1) threatened and intimidated her during his "fits of rage," (2) bruised her arm when he pushed past her, (3) damaged the marital home by punching holes in the walls and sawing down a door, and (4) threatened to kill her. Gary also testified that Joseph told him to "come get [his] fucking psychotic daughter now or I'll kill her." Gary believed that Megan and L.G.K.'s safety was in jeopardy and retained a private security firm to protect them. We also note that Joseph himself admitted in email correspondence that he (1) was weak in managing his depression and anger, (2) had been drunk too much and too often, and (3) made an appointment to reevaluate his depression medications to find the balance that worked for him.

Considering the testimony at the evidentiary hearing and the trial court's role in weighing the credibility of the witnesses, the trial court could reasonably conclude that Joseph was likely to commit another act of family violence. *See Boyd*, 425 S.W.3d at 433. Therefore, the family violence likelihood finding is not so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). Thus, we conclude that the evidence is factually sufficient to support a finding that Joseph is likely to commit family violence in the future. *See* Tex. Fam. Code §

85.001(a).

Having concluded that the evidence is legally and factually sufficient to support a finding that family violence is likely to occur in the future, we overrule Joseph's first issue.

## II.     Protective Order for a Period that Exceeds Two Years

In Joseph's second issue, he challenges the trial court's rendition of a thirty-five year protective order because there is insufficient evidence that Megan requires any protection from Joseph. Specifically, Joseph argues that imposing a thirty-five year protective order is "only punitive, which does not align with the word or spirit of the law which is designed to 'protect the applicant and prevent future violence.'" We disagree because Joseph exhibited a pattern of escalating behavior and threats and committed an act constituting a felony offense involving family violence against Megan.

Section 85.025 of the Family Code provides that the duration of a protective order is two years unless the court finds that the person who is the subject of the protective order:

> (1) committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense;
>
> (2) caused serious bodily injury to the applicant or a member of the applicant's family or household; or
>
> (3) was the subject of two or more previous protective orders rendered:
>
>> (A) to protect the person on whose behalf the current protective order is sought; and
>>
>> (B) after a finding by the court that the subject of the protective order:

(i) has committed family violence; and

(ii) is likely to commit family violence in the future.

Tex. Fam. Code § 85.025(a-1).

Section 85.001(d) provides that if a court renders a protective order for a period of more than two years, the court must include in the order a finding described by Section 85.025(a-1). *Id.* § 85.001(d); *see also Yang v. Cao*, 629 S.W.3d 666, 669 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding that finding in the judgment is required for protective order exceeding two years even if the evidence could support a longer duration of a protective order).

In the case before us, Megan requested the protective order be granted for a term in excess of two years because Joseph committed an act constituting a felony offense involving family violence. At the conclusion of the evidentiary hearing, the trial court entered a thirty-five year protective order against Joseph that provides:

> The Court finds that Applicant and Respondent are married but separated. The Court finds that family violence has occurred and that family violence is like to occur in the future. The Court finds that Respondent, Joseph Claude Henry, has committed family violence. The Court finds that the Respondent, Joseph Claude Henry, committed an act constituting a felony offense involving family violence against the applicant. The Court finds that the following protective orders are for the safety and welfare and in the best interest of the protected person, Megan Ann Whitlock-Henry, and are necessary for the prevention of family violence . . . . The Court finds that Respondent, Joseph Claude Henry, committed an action constituting family violence against Megan Ann Whitlock-Henry, regardless of whether the person has been charged with or convicted of the offense. IT IS THEREFORE ORDERED that this order shall continue full force and effect until September 1, 2056 or until further ORDER of this Court. IT IS FURTHER ORDERED that Respondent, Joseph Claude Henry, is permitted to seek further action in relation to this *Final Protective Order* effective September 1, 2022.

The trial court also issued findings of fact and conclusions of law, including the following:

> Applicant and Respondent are married but separated. Family violence has occurred. Family violence is likely to occur on the future. Respondent has committed an act constituting a felony offense involving family violence against the Applicant. Legally and factually sufficient evidence, and inferences drawn from that evidence, supports the finding that Respondent committed family violence in the past and is likely to commit family violence in the future . . . . Pursuant to Tex. Fam. Code § 85.011, a Protective Order is necessary for the safety and welfare of the Applicant and because the Court has found that family violence occurred in the past and is likely to occur in the future.

The record contains the following evidence to support the above finding. At the evidentiary hearing, Megan testified that Joseph, while driving a car, strangled her with both of his hands in front of her minor child. According to Megan, Joseph lunged across the car with both hands while screaming. On another occasion, Joseph threatened to kill her and gave her twelve hours to vacate the marital home. She also testified that on three separate occasions, Joseph punched holes in the walls of the marital home during his "fits of rage."

Keely believed that Joseph physically assaulted Megan and reported this to the Bellaire Police Department. After law enforcement left, Keely remained with Megan at the marital home. The following morning, Keely overheard a conversation where Megan told Joseph that she wanted to work out an amicable way to end their marriage and Joseph expressed that it was not his desire. Keely observed that Joseph was "unhappy with the thought of the marriage breaking up and that it was [Megan's] fault."

Joseph admitted to Gary that Joseph physically assaulted Megan. Gary believed Joseph's threat on Megan's life to be credible and retained a private security

15

firm to protect Megan and L.G.K. from Joseph.

In addition to the testimony, Megan offered, and the trial court admitted, an unsolicited email Joseph sent to Megan a few days following the physical assault where Joseph (1) apologized for his mean and vicious words and actions, which often came from a drunken place, (2) acknowledged a substance abuse problem, and (3) admitted that he had a mental health problem that likely required medication. Megan also offered, and the trial court admitted, without objection from Joseph, a copy of the criminal complaint charging Joseph with "Assault of Family Member – Impeding Breathing." *See* Tex. Penal Code §22.01(b).[5]

Under section 22.01(b), it is a third degree felony offense if a person impedes the normal breathing or circulation of the blood of another by applying pressure to the person's throat or neck. Further, in the criminal complaint, Officer Nathanael Rios with the Bellaire Police Department took both Megan's and L.G.K.'s statements. Officer Rios observed a red mark on Megan's throat. He also observed that when L.G.K. recounted the physical assault, she became "very emotional" and "expressed fear toward [Joseph] and did not want to be in the same residence as him."

From this evidence, the trial court could have determined that family violence occurred, was likely to occur in the future, and that Joseph committed an act constituting a felony offense involving family violence. *See* Tex. Fam. Code §§ 81.001, 85.001(b), 85.025(a-1); *see also* Tex. Penal Code § 22.01(b). Thus, there is

---

[5] A person commits an offense if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

16

sufficient evidence that Joseph committed an act constituting a felony offense involving family violence against the applicant, Megan. *See City of Keller*, 168 S.W.3d at 810. We conclude that the evidence is legally and factually sufficient to support the protective order for a period that exceeds two years. *See* Tex. Fam. Code § 85.025(a-1).

Although we have concluded that a thirty-five year protective order is not against the great weight and preponderance of the evidence on this record, we note that a person subject to a protective order effective for longer than two years may file a motion requesting that the trial court review the protective order to determine whether a continuing need exists for protection. *Id.* § 85.025(b). The person must wait one year after the trial court signs the protective order to seek review of it and must wait another year to seek review again if the trial court denies the person's first motion for review. *Id.* § 85.025(b), (b-1). The person is limited to two motions for review; if both are denied, the protective order remains in effect until its stated expiration date. *Id.* § 85.025(b-2).

Accordingly, we overrule Joseph's second issue.

## III. Conditions of the Protective Order

In his third issue, Joseph primarily challenges the conditions of the amended protective order requiring him to: (1) make an appointment for a substance abuse evaluation at The Council on Recovery and follow all treatment recommendations promulgated by The Council on Recovery, (2) undergo a mental health evaluation for explosive anger with a duly licensed mental health professional and follow all recommendations of said mental health professional, (3) provide proof of compliance from his treating mental health professional and/or substance abuse provider, including urinalysis results regarding medication compliance, and (4) sign

a HIPAA authorization for the release of his (a) substance abuse evaluation, (b) mental health evaluation, and (c) ongoing mental health treatment and substance abuse treatment. Joseph argues that Megan did not plead, nor is there any evidence to indicate that he has a substance abuse or mental health problem and requests that we reverse the portions of the amended protective order that were previously stayed.[6] In response, Megan argues that the trial court properly rendered the amended protective order because the Family Code permits a trial court to enter orders that are necessary or appropriate to prevent or reduce the likelihood of family violence. We agree with Megan.

---

[6] On October 20, 2021, Joseph filed a motion in this court requesting emergency relief. Joseph sought a stay of the trial court's oral order on October 5, 2021, to produce witnesses at a hearing to be held on October 25, 2021, and a stay of certain provisions in the amended protective order signed October 1, 2021. We previously granted the motion and issued a stay of the following provisions until final decision by this court in the appeal or until further order of this court: (1) Joseph "shall make an appointment for substance abuse evaluation at The Council on Recovery, located at 303 Jackson Hill Street, Houston, Texas 77007" on or before September 17, 2021; (2) Joseph "shall follow all treatment recommendations promulgated by The Council on Recovery"; (3) Joseph "shall undergo a mental health evaluation for explosive anger with a duly licensed mental health professional" on or before September 17, 2021; (4) Joseph "shall remain in treatment which [sic] such mental health professional for his explosive anger and shall follow all recommendations of said mental health professional; (5) Joseph "shall comply with all treatment, whether inpatient or outpatient, as well as recommendations of the licensed mental health professional [and] remain compliant with any medications as prescribed by his mental health professional"; (6) Joseph shall "sign a HIPAA Authorization authorizing the release of his substance abuse evaluation to" Megan's attorney; (7) Joseph shall "execute a HIPAA Authorization authorizing the release of his mental health evaluation to" Megan's attorney; (8) Joseph shall "file the results of his mental health evaluation with this Honorable Court within forty-eight hours of issuance of the evaluation"; (9) Joseph shall "execute a HIPAA Authorization authorizing the release of his ongoing mental health treatment and substance abuse treatment, including urinalysis results regarding medication compliance to [Megan's attorney] for so long as this Final Protective Order is in effect"; (10) Joseph shall "provide proof of compliance via a letter from his treating mental health professional and/or substance abuse provider to [Megan's attorney] every six months, beginning March 1, 2022, and on the dates March 1 and September 1 of each and every year that this Final Protective Order is in effect"; (11) Joseph shall "provide with said letter the results of his urinalysis testing to show compliance with any prescribed medications"; and (12) Joseph shall sell or surrender to the Harris County Sheriff's Office any and all firearms or ammunition possessed by him no later than ten (10) days following execution of the final protective order.

We review the prohibitions and awards entered in a protective order for an abuse of discretion. *See In re Doe*, 19 S.W.3d at 253 ("The abuse of discretion standard applies when a trial court has discretion either to grant or deny relief based on its factual determinations."); *see also Dolgener v. Dolgener*, 651 S.W.3d 242, 256 (Tex. App.—Houston [14th Dist.] Aug. 31, 2021, no pet.); *see generally Rodriguez*, 614 S.W.3d at 385-86 (noting that Family Code section 85.022(b), which also governs protective orders, gives the trial court discretion to prohibit certain conduct).

A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Flowers v. Flowers*, 407 S.W.3d 452, 457 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). A trial court does not abuse its discretion when some evidence reasonably supports its decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

To the extent that Joseph argues that the trial court abused its discretion in granting relief that was not pleaded for, we note that "[e]ven without pleadings to support these awards, unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings." *See Yang*, 629 S.W.3d at 674 (citing *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991)); *accord Bednarz v. State*, 176 S.W.2d 562, 563 (Tex. 1943); *Watts v. St. Mary's Hall, Inc.*, 662 S.W.2d 55, 58 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.); *see also* Tex. R. Civ. P. 67. A party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Roark*, 813 S.W.2d at 495; *see* Tex. R. Civ. P. 67.

In the case before us, Joseph did not complain to the trial court that the

19

challenged provisions were not supported by Megan's pleadings; therefore, Joseph cannot raise the issue for the first time on appeal. We turn next to Joseph's argument that the trial court lacked authority to require him to (1) undergo substance abuse and mental health evaluations and treatment, (2) provide proof of compliance from his treating mental health professional and/or substance abuse provider, and (3) execute HIPAA authorizations for the release of his mental health and substance abuse evaluation and treatment.

### A. Substance Abuse and Mental Health Evaluation

Joseph argues that there is no basis in law or evidence that he be ordered to participate in substance abuse and mental health evaluations and treatment. Joseph contends that "[n]o allegations or evidence indicate [he] has a 'substance-abuse' problem." Likewise, Joseph posits that "the *only* reference to any 'substance' use was Megan's testimony that—on the night of the *one* alleged act of domestic violence—Joseph, Megan, Calvin (Joseph's son), and Claire (Joseph's daughter) drank some wine." Joseph further argues that "no statute or evidence supports the requirement that [he] 'undergo a mental health evaluation.'" As discussed below, these allegations are not supported by the record because Joseph, himself, put his substance abuse and mental health at issue when he emailed Megan, and section 85.022 permits a trial court broad discretion in determining necessary and appropriate acts to prevent or reduce the likelihood of family violence. *See* Tex. Fam. Code § 85.022(a).

In support of his proposition that it is "reversable error for the trial court to include provisions in a protective order that are not tailored to the fact of the case and necessary to prevent or reduce the likelihood of family violence," Joseph cites *In re M.G.M.*, 163 S.W.3d 191, 200-01 (Tex. App.—Beaumont 2005, no pet.). A close examination of *In re M.G.M.*, however, reveals that this authority supports the

20

plain wording of section 85.022, which gives trial courts broad discretion to "order the person found to have committed family violence to perform acts specified by the court that the court determines are necessary or appropriate to prevent or reduce the likelihood of family violence." *See* Tex. Fam. Code § 85.022(a).

*In re M.G.M.* involved a temporary ex parte protective order issued in Texas and a concurrent divorce and child custody proceeding in Michigan. 163 S.W.3d at 194. While the Texas trial court had temporary emergency jurisdiction under section 152.204(a) of the Family Code to issue an ex parte temporary protective order for the protection of the applicant and the children, the temporary emergency jurisdiction under section 152.204(a) to enter a temporary protective order was limited in scope to provisions that would ensure the physical safety of applicant and the children. *Id.* at 197, 199-200. The protective order at issue contained provisions from both section 85.021 and section 85.022 and required the defendant to pay child support and complete a battering intervention and prevention program, and prohibited the defendant from "transferring, encumbering, or otherwise disposing of property mutually owned or leased by the parties." *Id.* at 197-98. The appellate court found that it was error to include any conditions that were not reasonably related to *temporary* emergency protection from family violence, i.e., conditions referring to child support, a battering intervention and prevention program, and encumbering mutually owned property. *Id.* at 199-200 (emphasis added).

The facts presented in *In re M.G.M.* are not analogous to the case before us for multiple reasons. First, *In re M.G.M.* addressed temporary emergency protections while Joseph challenges the rendition of a *final* protective order. Second, the trial court's amended *final* protective order falls within the ambit of section 85.022. *See Rodriguez,* 614 S.W.3d at 385.

The trial court heard testimony that on the night of the physical assault, Joseph

was drinking. Megan offered, and the trial court admitted, the criminal complaint where Megan told Officer Rios that Joseph was "highly intoxicated" after dinner. Further, Megan offered, and the trial court admitted, an email sent from Joseph to Megan acknowledging in part that Joseph had a substance abuse problem, i.e., alcohol, and a mental health problem, i.e., depression. As discussed above, the email, in its relevant parts, stated that (1) "all of my mean and vicious words and actions . . . came from a childish and most often drunken place," (2) "I have been weak in managing my depression and anger," (3) "I have been drunk too much and too often," (4) I have been arrogant in my drinking," (5) "I am making an appointment to go back to a doctor to reevaluate depression medications," and (6) "[i]f AA or another program is appropriate, I will follow that road."

Although section 85.022 does not specifically list participating in substance abuse and mental health evaluations and treatment, there is no authority (and Joseph cites no authority suggesting) that the provisions of section 85.022 are intended to be an exhaustive list of remedies available to a trial court when issuing a protective order that will effectively prevent family violence. *See Rodriguez*, 614 S.W.3d at 386. Such an interpretation is contrary to the permissive language in the statute and falls short of the legislative intent of the statute. *Id.* Considering the testimony at the evidentiary hearing and the trial court's role in weighing the credibility of the witnesses, we conclude that the trial court was within its discretion to order Joseph, "the person found to have committed family violence, to perform acts specified by the court that the court determines are necessary or appropriate to prevent or reduce the likelihood of family violence." Tex. Fam. Code § 85.022(a).

Accordingly, the trial court did not act arbitrarily or unreasonably or without reference to guiding rules or principles in requiring that Joseph (1) make an appointment for a substance abuse evaluation at The Council on Recovery and

follow all treatment recommendations promulgated by The Council on Recovery and (2) undergo a mental health evaluation for explosive anger with a duly licensed mental health professional. *See Flowers*, 407 S.W.3d at 457.

## B. Proof of Compliance

Joseph also challenges the provisions of the amended protective order requiring him to submit proof of compliance with "all treatment, whether inpatient or outpatient," as well as recommendations of the licensed mental health professional and compliance with any medications prescribed by his mental health professional, contending that there is no statutory authority. While Joseph posits that he was required to provide proof of compliance with the mental health and substance abuse evaluation and treatment for a thirty-five year period, the plain language of the amended protective order limits proof of compliance to two years or further order from the court.

As discussed above, the evidence is sufficient to support the trial court's family violence finding, and section 85.002 allows a trial court to order the person who has committed family violence to perform certain acts necessary or appropriate to prevent or reduce the likelihood of family violence. Tex. Fam. Code § 85.022(a); *see also Rodriguez*, 614 S.W.3d at 385. Because the evidence was legally and factually sufficient to support the trial court's family violence finding, the evidence was likewise sufficient to support the requirement that Joseph provide proof of compliance from his treating mental health and/or substance abuse provider, including the results of his urinalysis testing to show compliance with any prescribed medications for a period of two years or until further order of the court.

## C. HIPAA Authorization

Joseph contends that there is no statutory authority requiring HIPAA

authorizations for his medical records to opposing counsel. At the risk of being repetitive, we emphasize that the permissive language of section 85.022 allows the trial court to order a person found to have committed family violence to perform certain acts the trial court determines "necessary or appropriate to prevent or reduce the likelihood of family violence." Tex. Fam. Code § 85.022.

"The legislative intent in passing Title IV was to 'reduce the high incidence of deaths and injuries sustained by law enforcement officers in handling family disturbances and to aid law enforcement officers in protecting victims of family violence from serious or fatal injuries.'" *Jackson v. Jackson*, No. 01-14-00952-CV, 2015 WL 8940117, at *4 (Tex. App.—Houston [1st Dist.] Dec. 15, 2015, no pet.) (mem. op.) (quoting Act of April 19, 1979, 66th Leg., R.S., ch. 98, § 1, 1979 Tex. Gen. Laws 182, 182 (repealed and reenacted 1997)). "The purpose of the statute is to provide an expedited procedure for victims of domestic violence; the purpose is not to correct past wrongs or establish liability but to give immediate protection to the applicant." *Roper v. Jolliffe*, 493 S.W.3d 624, 634 (Tex. App.—Dallas 2015, pet. denied). The scope of family violence protective orders will vary considerably depending on the circumstances. *See Rodriguez*, 614 S.W.3d at 385.

In the case before us, the trial court heard testimony that Joseph committed an act of family violence after consuming alcohol. The trial court also admitted evidence establishing that Joseph (1) had the propensity to drink "too much and too often," (2) lacked the ability to manage his "depression and anger," and (3) needed "to go back to a doctor to reevaluate depression medications." Thus, it was within the trial court's discretion to require Joseph to execute HIPAA authorizations to establish compliance with and track the progress of his ongoing substance abuse and mental health treatment.

Accordingly, we overrule Joseph's third issue.

24

## *Conclusion*

Having overruled all of Joseph's issues, we affirm the amended protective order and lift our October 22, 2021, order staying the trial court's amended protective order.

/s/    Frances Bourliot
        Justice

Panel consists of Justices Jewell, Bourliot, and Zimmerer.